# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| JAMES WHETZEL, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:07-CV-210 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff James Whetzel appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying Whetzel's application under the Social Security Act (the "Act") for a period of disability, Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI").  (Docket # 1.)  Pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and Northern District of Indiana Local Rule 72.1(d)(1), District Judge Theresa Springmann referred the appeal to the undersigned Magistrate Judge on December 28, 2007, for the issuance of a Report and Recommendation.  (Docket # 10.)

Having reviewed the record, the undersigned Magistrate Judge recommends that the Commissioner's decision be AFFIRMED.  This Report and Recommendation is based on the following facts and principles of law.

1

# I. PROCEDURAL HISTORY

In March 2004, Whetzel applied for DIB and SSI, alleging disability as of September 1, 1996. (Tr. 60, 337; *see also* Tr. 14.) The Commissioner denied his application initially and upon reconsideration, and Whetzel requested an administrative hearing. (Tr. 32-33.) On December 8, 2006, Administrative Law Judge ("ALJ") Terry L. Miller conducted a hearing at which Whetzel, who was represented by counsel, his mother, and a vocational expert testified. (Tr. 329-69.)

On January 26, 2007, the ALJ rendered an unfavorable decision to Whetzel, concluding that he was not disabled because he could perform a significant number of jobs in the national economy despite the limitations caused by his impairments. (Tr. 14-24.) The Appeals Council denied Whetzel's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 6-8.) On August 13, 2007, Whetzel filed a complaint with the district court, seeking relief from the Commissioner's final decision. (Docket # 1.)

In his complaint, Whetzel asserts three errors in the Commissioner's final decision. Specifically, he contends that: (1) the ALJ's credibility determination is erroneous; (2) the ALJ improperly evaluated the opinion of Dr. Cyran, Whetzel's treating psychiatrist; and (3) the ALJ's finding that Whetzel only had moderate limitations in concentration was not supported by substantial evidence. (Pl.'s Opening Br. ("Opening Br.") at 13-25.)

## II. FACTUAL BACKGROUND[1]

### *A. General Background*

At the time of the ALJ's decision, Whetzel was twenty-one years old, had a high school diploma, attended one semester of college, and had past work experience as a bagger at a supermarket. (Tr. 40, 45, 49, 252, 336.) Whetzel alleged disability as of September 1, 1996, due to epilepsy, Asperger's syndrome, and neurofibromatosis. (Tr. 39, 59, 82, 337.)

### *B. Hearing Testimony*

An administrative hearing was held on December 8, 2006. (Tr. 329-69.) Whetzel testified that he dropped out of college because the pressure caused seizures, and that he was currently working six to ten hours per week at McDonald's, dishwashing and cleaning. (Tr. 335-37.) He added that could not get more hours because his employer feared a seizure. (Tr. 335.) He stated that previously he was fired from a dishwashing job at a pizza place because he called off work too often due to his seizures. (Tr. 338.) He explained that he would have seizures if under extreme stress, but they were not as frequent if he was taking his medication. (Tr. 339.) He mentioned that medicine controlled his seizures "most of the time" and he experienced no side effects from the medication. (Tr. 340-41.) He stated that he last had a grand mal seizure sometime earlier that year. (Tr. 340.) Whetzel also explained that after a seizure he feels fatigued for fifteen to twenty minutes, and dazed and confused for ten minutes to an hour; otherwise, Whetzel claimed no problems with walking, standing, sitting, postural activities, or using his hands. (Tr. 341-42.) He further testified that he also has petit mal seizures about every day, lasting for half an hour to an hour, which tire him. (Tr. 353.) He added that his speech

---

[1] The administrative record in this case is voluminous (369 pages), and the parties' disputes involve only small portions of it. Thus, in the interest of brevity, this opinion recounts only the portions necessary to the decision.

becomes slurred daily when concentrating on a single thing, and he has memory problems. (Tr. 343.)

Whetzel also testified that he has problems talking to strangers, but visits three close friends almost daily with whom he plays video or card games (Tr. 344-45), and engages in a role-playing game with friends about once a week (Tr. 352). He added that he plays video games for a half hour to two hours daily but his hands sometimes shake after awhile. (Tr. 345.) He described his typical day, which involves going to the library to use the internet for an hour and a half, then helping some elderly neighbors take out their trash and pick up their mail. (Tr. 346.) He stated that he enjoys reading, although he has problems remembering what he read. (Tr. 348.)

Whetzel stated that he lives in an apartment with his fiancee and that she usually cooks because he once burned his hand during a seizure, but they go grocery shopping monthly and he does household chores. (Tr. 334-35, 350-51). He said that he has a driver's license without restrictions and likes to drive, but has trouble affording gas. (Tr. 336, 351-52). He stated that he naps before work to prevent petit mal seizures. (Tr. 354.) He affirmed that he could do a full-time job where he did not have to work around hazards, frequently deal with people, and could sit from time to time, but acknowledged that he had a bad seizure when he attempted to work more hours at McDonald's. (Tr.352, 354-55.)

Whetzel's mother, Roberta Willits, testified that Whetzel needs to sleep for eight or nine hours after a seizure, and that he frequently has petit mal seizures even when medicated. (Tr. 356-57.) She further stated that he had more seizures when he tried to work longer hours. (Tr. 358-59.) Ms. Willits testified that Whetzel has Asperger's syndrome and that he is unable to

4

keep track of his appointments (which is apparently how he lost his Medicaid).  (Tr. 359-60.)

## C.  Relevant Medical Background

Whetzel had his first seizure in 1998, at age thirteen, and was placed on medication.  (Tr. 135, 291, 278.)  From 1999 to 2003, Whetzel sought treatment from neurologist T.R. Vidic, M.D., of the Elkhart Clinic Department of Neuroscience.  (Tr. 104-32.)  In May 1999, Dr. Vidic began treating Whetzel with Dilantin for stable partial complex seizures ("PCS") disorder.  (Tr. 132.)  In August 1999, Whetzel had a seizure that took him all day to come out of, and the next month Dr. Vidic advised Whetzel's school that he should not overexert himself in physical education.  (Tr. 130, 132.)  On November 1, 1999, Dr. Vidic noted that Whetzel's partial complex epilepsy was stable (Tr. 131), but then Whetzel had a seizure later that month and one in December, hitting his head on one occasion.  (Tr. 121, 130.)

Following another seizure in January 2000, Dr. Vidic opined that Whetzel has both partial complex and myoclonic seizures and adjusted his medication.  (Tr. 126.)  In March 2000, Dr. Vidic reported no seizures since January, noting that Whetzel's condition was "much better" on medication.  (Tr. 127.)  Dr. Vidic recorded that Whetzel's speech was slightly dysarthric and that there was a slight tremor on sustension, and he adjusted his medication.  (Tr. 125, 127.)  An October 2000 note records no seizures or medication side effects.  (Tr. 122.)

Whetzel had no seizures again until August 2001, when he had three between August 29 and September 7, 2001, sustaining a minor skull fracture with a stable concussion during one. (Tr. 116, 118, 242.)  His medication levels were therapeutic and Dr. Vidic added Lamictal.  (Tr. 116, 118.)  In March, 2002, Dr. Vidic wrote that Whetzel had no seizures since September 2001, his seizure disorder was stable, and he was taking his medications regularly.  (Tr. 112, 115.)  On

November 4, 2002, Whetzel's partial complex seizures were "under good control" and Dr. Vidic opined that neither the seizures nor medications would cause a memory impairment. (Tr. 114.)

On March 3, 2003, Whetzel's mother reported to Dr. Vidic that he recently had two seizures. (Tr. 111.) His laboratory tests showed that his medication, Depakote, was in the normal range but Whetzel had not been taking his Lamictal. (Tr. 110, 240.) However, by April 2003 Whetzel's Lamictal levels were within the therapeutic range. (Tr. 236.) On June 18, 2003, he was taken by ambulance to Lagrange Community Hospital ("LCH") emergency room ("ER") after a generalized seizure and reported increased seizure activity; the ER doctor wrote that she suspected that Whetzel was noncompliant with his Lamictal. (Tr. 219-28). On June 24, 2003, Dr. Vidic adjusted Whetzel's medications and ordered him not to drive until he was seizure-free for three months. (Tr. 106-7.)

Whetzel then began visiting James D. Heckaman, M.D., F.A.C.P., F.A.A.N., on June 30, 2003. (Tr. 276-77.) Dr. Heckaman noted that Whetzel was having breakthrough seizures approximately once a month; he recommended stress management and adjusted his medications. (Tr. 277.) Physical and mental status examinations were normal. (Tr. 276-77.) A July 2003 EEG was normal, but a brain MRI revealed a single focal area of increased signal activity. (Tr. 274.) In July and August 2003, Whetzel's Depakote and Tegretol levels were therapeutic and Dr. Heckaman advised he could begin weaning off Lamictal, but his mother reported that he was already off Lamictal and having petit mal seizures, including two on August 10, 2003. (Tr. 268, 272.) She advised that Whetzel had been living on his own and Dr. Heckaman increased his Tegretol. (Tr. 268.)

From August to November 2003, Whetzel was treated at the ER four times for about six

seizures, having also hit his head on multiple occasions and once experiencing a grand mal tonic clonic seizure with foaming at the mouth while at the hospital, requiring sedation. (Tr. 135-36, 191-202, 203-06, 212-18.) He reported an increase in petit mal seizure activity. (Tr. 212.) The ER notes indicate that Whetzel was living on his own and not regularly taking his medication. (Tr. 135, 192, 203, 212.) On November 1, 2003, a head CT scan was normal, and he was diagnosed with seizure disorder secondary to medical noncompliance. (Tr. 192.)

Ms. Willits called Dr. Heckaman's office on November 3, 2003, and reported Whetzel had two more seizures that day and one the day before. (Tr. 266.) Lab tests revealed that his medication levels were therapeutic. (Tr. 265.) Dr. Heckamen wrote that Ms. Willits reported that Whetzel does not take his medication regularly and that she believed her son was depressed. (Tr. 263.) Dr. Heckaman observed that Whetzel appeared depressed and ordered Zoloft, also recommending a neuropsychological follow-up. (Tr. 263-64.) A 24-hour EEG on November 24, 2003, was abnormal, suggestive of potentially focal epileptiform disturbance of cerebral function confined to the frontotemporal head region, capable of secondary generalization. (Tr. 261.)

In early January 2004, Whetzel's medication levels were normal and Ms. Willits informed the doctor that Whetzel had not had any seizures since his medication was increased. (Tr. 257-58.) Two months later, however, he was admitted to the ER by ambulance for a grand mal seizure. (Tr. 182-90.) Whetzel admitted that he forgot to take his medication the previous day and had not been faithful in taking it on a long-term basis. (Tr. 182.) Whetzel's medication levels were subtherapeutic, and the doctor gave him loading doses and advised him to take his medications faithfully. (Tr. 182-90.)

On May 29, 2004, Whetzel underwent a consultative psychological evaluation with Dr.

Rosalind Huang, clinical psychologist. (Tr. 138-43.) Dr. Huang observed that Whetzel's comprehension was good but his concentration and memory were weak. (Tr. 139.) Ms. Willits informed that Whetzel's seizures had increased in frequency and intensity and he needed to rest two days before resuming normal activities after a seizure because he became very tired, and Dr. Huang opined that under this condition Whetzel could only work part-time. (Tr. 139.) She elaborated that his seizures affected his memory, which in turn affected his concentration. (Tr. 139.) Dr. Huang administered the WAIS-II, on which Whetzel received IQ scores placing him in the average range of intelligence and which indicated weaknesses in concentration and visual-motor speed and coordination. (Tr. 139-40.) Dr. Huang concluded that Whetzel did not have a learning disability, deferred a psychological diagnosis, and assessed a Global Assessment of Functioning ("GAF") score of 50.[2] (Tr. 140.) She further found that Whetzel's seizures affect his memory and concentration and that he must rest two days to recover from one. (Tr. 140.) She opined that Whetzel likely needs assistance in managing his funds. (Tr. 140.)

In August 2004, the agency psychologist opined that Whetzel did not have a medically determinable mental impairment, but a coexisting nonmental impairment requiring referral to another specialty. (Tr. 162-75.) The determination was affirmed in October. (Tr. 162.)

In August 2004 Whetzel began counseling at the Northeast Center ("NEC") where his supervising psychiatrist was Dr. Frank Cyran. (Tr. 299-300.) Ms. Willits filled out a behavioral health assessment and indicated that he had seizures once a month but had not been taking his

---

[2]The Global Assessment of Functioning Scale is used by physicians to report the individual's overall level of functioning. *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-IV-TR) 32-34 (4th ed. Text Revision 2000) (hereinafter "DSM-IV-TR"). A GAF of fifty indicates serious symptoms or any serious impairment in social, occupational, or school functioning. DSM-IV-TR 34.

medications regularly.  (Tr. 301.)  The clinician's review noted that his seizures were generally controlled with medication "if he takes it" and that he had to drop out of college because he did not consistently take his medicine.  (Tr. 299.)  Whetzel reported low self-esteem and trouble sleeping.  (Tr. 299.)  Upon admission he was assessed with Mild Depressive Episode, single, mild; Personality Disorder, NOS, provisional; and a GAF score of 45.[3]  (Tr. 299.)

On September 8, 2004, Whetzel was transported to the ER after a bystander found him during a seizure.  (Tr. 145-53.)  The ER report stated that Whetzel "was apparently noncompliant with his medications" and historically his Tegretol and Depakote levels "were always subtherapeutic."  (Tr. 145.)  His Tegretol level was nontherapeutic because he had run out of it, and he was trying to get on Medicaid.  (Tr. 145.)  He was counseled on the need for medication compliance, instructed not to drive, and given assistance in pursuing Medicaid.  (Tr. 145-46.)

On October 8, 2004, at Dr. Heckaman's request, Whetzel saw pediatric neurologist C. Joe Ottinger, M.D., concerning a possible Asperger's syndrome diagnosis.  (Tr. 250-51.)  Dr. Ottinger observed numerous café au lait spots on Whetzel's neck, trunk, and back, as well as axillary freckling.  (Tr. 250.)  Dr. Ottinger could not confirm an Asperger's diagnosis but found that he "almost certainly" has neurofibramatosis type 1, which could be a "major explanation" for his problems. (Tr. 251.)  He also recommended further testing for Asperger's.  (Tr. 251.)

On October 22, 2004, state agency physician Dr. J. Lavallo performed a Physical Residual Functional Capacity Assessment and opined that Whetzel had no exertional limitations, but was limited to occasionally climbing ramps and stairs; never climbing ropes, ladders, and scaffolds; and that he should avoid all hazards.  (Tr. 154-62.)

---

[3]A GAF score of forty-five indicates "[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning . . . ."  *Id*. at 34.

November and December 2004 brought two more seizures, resulting in at least one ER visit, and Dr. Ottinger's notes continued to indicate medication noncompliance. (Tr. 246, 248-49.) On December 15, 2004, Dr. Ottinger referred Whetzel to neuropsychologist Frank Dodzik, Psy.D., H.S.P.P. (Tr. 290-92.) Dr. Dodzik observed that Whetzel's MRI findings were not inconsistent with Dr. Ottinger's diagnosis of neurofibromatosis. (Tr. 291.) He found that Whetzel's seizures did not fit the pattern for breakthrough seizures, and Whetzel reported he had a great deal of trouble remembering to take his medications. (Tr. 292.) Dr. Dodzik encouraged him to be more compliant and indicated that more cogent treatment planning could be performed in thirty days after better medication compliance and neurological testing. (Tr. 292.)

On January 17, 2005, Dr. Dodzik performed a neuropsychological evaluation on Whetzel. (Tr. 285-89.) Results on the WAIS-III showed an average IQ, weaknesses in working memory and attention, but no evidence of a learning disability. (Tr. 286.) Dr. Dodzik concluded from tests that Whetzel's processing speed in both reading and math was slow, but his comprehension and math abilities were adequate. (Tr. 286.) Testing of Whetzel's fine and gross motor skills indicated moderately impaired fine motor speed in the dominant hand and mild impairment in the non-dominant hand, average motor strength, low average motor speed, and average motor dexterity. (Tr. 286-87.) Attentional capacity and control tests revealed some scores in the average and moderate ranges, as well as "marked impairments in many measures of inattentiveness and vigilance over time," suggesting difficulties with attentional capacity and control. (Tr. 287.) He also demonstrated mild impairment in working memory and problems with facial recognition. (Tr. 287.) Dr. Dodzik also administered the Minnesota Multi-Phasic Personality Profile (MMPI-2), and concluded that that Whetzel had "mild elevations" on the

scales for paranoia, thought disorder, and social introversion. (Tr. 287.) An Asperger's syndrome test showed "mild signs" and some symptomatology, but not "the full blown learning disability or cognitive complaints that often accompany it." (Tr. 288.)

Whetzel had been compliant with his medications and seizure-free for two months, since Dr. Dodzik provided him with two new pill boxes (one with an alarm), and he opined that his seizures were related to medication compliance. (Tr. 288.) He concluded that Whetzel experienced lingering working memory and attention problems typical of seizure disorders, noting that many patients with ongoing seizure activity have attentional difficulties. (Tr. 288.) Dr. Dodzik recommended adaptive services and a stimulant medication to aid in returning to school and finding employment, depending upon his medication compliance. (Tr. 288-89.)

On March 10, 2005, Dr. Ottinger reported that, based on Dr. Dodzik's testing, Whetzel was functioning in the average range and demonstrated probable mild to moderate Asperger's syndrome. (Tr. 314.) He informed that Whetzel was doing better with his medications and had no seizures since the prior December. (Tr. 314.) Dr. Ottinger indicated that epilepsy surgery would be inappropriate if the seizures could be controlled with medication. (Tr. 314.)

On March 21, 2005, Dr. Cyran, psychiatrist at the NEC, completed a Medical Source Statement of Ability to Do Work-Related Activities. (Tr. 283-84.) Dr. Cyran opined that Whetzel had marked limitations in understanding, remembering, and carrying out short simple instructions, and making judgments about simple work-related decisions. (Tr. 283.) He further found extreme limitations in understanding, remembering, and carrying out detailed instructions. (Tr. 283.) Dr. Cyran explained that these restrictions are supported by the fact that Whetzel does not follow through with recommendations, and that a neuropsychological evaluation shows he

11

has weakness of working memory. (Tr. 283.) Dr. Cyran found marked social limitations, including interacting with others in the workplace, explaining that Whetzel exhibits social introversion, some paranoia, and schizoid traits. (Tr. 284.)

On September 15, 2005, the NEC reviewed Whetzel's service plan, indicating a diagnosis of major depressive disorder, single episode, mild; a provisional diagnosis of a personality disorder; and a current GAF score of 45.[4] (Tr. 297.) Whetzel had not seen a psychiatrist, had not received nursing services, but had met with a therapist once. (Tr. 297.) The review noted that he had a job as a dishwasher working four nights a week, and both a therapist and case manager cut back on contacts due to his stability. (Tr. 297.) Another plan review on December 5, 2005, had the same diagnosis but found that Whetzel had not seen a case manager since July 2005, had not met with a therapist since September 2005, and had requested no services since July. (Tr. 296.) Whetzel's treatment was terminated on January 10, 2006, the summary indicating that he had seen a therapist twenty-two times between August 27, 2004, and September 9, 2005. (Tr. 295.)

Whetzel began working at McDonald's, and Dr. Ottinger's notes from June and July 2006 indicated that he was having seizures, was not taking his medication, and could not afford the medicine but was trying to get back on Medicaid. (Tr. 308-11.) Dr. Ottinger adjusted his prescription and recommended that he avoid equipment that could cause injury in the event of a seizure. (Tr. 306-09.) Whetzel went to the ER on August 9, 2006, following three seizures that day, reporting daily seizure activity but that he was not taking any medicine due to lack of finances. (Tr. 318.) A CT brain scan revealed no abnormalities. (Tr. 319.)

---

[4]*See supra* n.3.

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart,* 395 F.3d 737, 744 (7th Cir. 2005) (internal quotations and citations omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

### IV. DISCUSSION

#### A. Legal Framework

Under the Act, a plaintiff is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental

impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

In determining whether Whetzel is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required him to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

*B. The ALJ's Decision*

In a written decision issued January 26, 2007, the ALJ determined that Whetzel was not disabled. (Tr. 14-24.) The ALJ found at step one that Whetzel had not engaged in substantial gainful activity since his alleged onset date. (Tr. 16.) He next found at step two that Whetzel's

---

[5] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

epilepsy/seizure disorder, depression, personality disorder, and signs of Asperger's Syndrome were severe impairments. (Tr. 17.) At step three, however, the ALJ found that Whetzel did not have an impairment or combination of impairments that met or medically equaled a listing. (Tr. 17-20.) The ALJ then ascertained that Whetzel has an RFC that restricts him to light work, and that he should never climb ladders, ropes, or scaffolds; only occasionally climb ramps and stairs; cannot perform fast finger or hand movements; cannot have frequent verbal communication with others; and should avoid all hazards. (Tr. 20.) The ALJ further limited Whetzel to "simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple work-related decisions and, in general, relatively few workplace changes." (Tr. 20.) He elaborated, "The claimant cannot work with the general public and can have only occasional and brief interactions with supervisors and co-workers. The claimant cannot perform work requiring frequent reading or which requires mathematical calculations, such as cashier or teller work." (Tr. 20.)

Based on this RFC, the ALJ determined at step four that Whetzel has no past relevant work. (Tr. 23.) Relying on testimony from the VE, the ALJ found at step five that Whetzel had the age, education, work experience, and RFC to perform a significant number of jobs in the national economy, including laundry folder, cafeteria attendant, and cleaner/maid. (Tr. 24.) As a result, Whetzel was not entitled to either DIB or SSI. (Tr. 24.) In reaching this decision, the ALJ concluded that Whetzel's testimony and that of his mother regarding the "intensity, persistence and limiting effects of his symptoms [were] not entirely consistent with or fully supported by the medical and other evidence of record, nor by his course of conduct." (Tr. 22.)

*C.  The ALJ's Credibility Determination Should Not Be Disturbed.*

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference.  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  If an ALJ's determination is grounded in the record, and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge from the evidence to [the] conclusion," *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal quotation and citation omitted), his determination will be upheld unless it is "patently wrong."  *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

With respect to Whetzel's credibility, the ALJ determined that Whetzel's and his mother's statements "concerning the intensity, persistence and limiting effects of his symptoms are not entirely consistent with or fully supported by the medical and other evidence of record, nor by his course of conduct."  (Tr. 22 (citation omitted).)  The ALJ explained, "The evidence generally shows that there is a pervasive seizure medication non-compliance issue[,]" noting that the record is replete with references to Whetzel's medication noncompliance, and indications that when he complies his condition is stable.  (Tr. 22.)  The ALJ specifically pointed to Dr. Ottinger's records indicating that his seizures improved when he was taking his medications on a regular basis.  (Tr.  22.)  The ALJ also acknowledged, "financial constraints were cited in the medical evidence for [Whetzel's] lack of medication, which led to seizure episodes, despite the fact that the claimant has been working on a fairly sustained basis."  (Tr. 22 (citations omitted).)

The ALJ then reasoned that Whetzel's testimony and conduct did not demonstrate disability, elaborating that he has a fiancee who he lives with in their own apartment, and that he has friends he sees daily and with whom he watches movies and plays games. (Tr. 22.) The ALJ then explained,

> "The undersigned finds that this is a sympathetic case involving a young man who obviously has serious problems with a seizure disorder overlaid with a suspected developmental disorder thought to be Asperger's syndrome. On a positive note, [Whetzel] has worked on a part-time basis at fairly simple jobs (e.g., bagger, dishwasher and cleaner) since he was in high school. The claimant has fairly good IQ scores in the average range, but . . . neuropsychological testing noted some signs consistent with Asperger's syndrome, such as weakness in working memory, slow reading and math speeds, lack of fine motor speed in his dominant right hand . . . , difficulties in attention span, and some social introversion, but Dr. Dodzik concluded that some of his attention problems were probably due to seizures."

(Tr. 22 (citations omitted).) The ALJ next reasoned that "this case presents a 'chicken/egg' scenario in that [Whetzel] has seizures due to not taking his medications on a regular basis, but the seizures allegedly cause memory/attention problems that cause him to forget to take his medications." (Tr. 22.) The ALJ then noted that the alarmed pill box Dr. Dodzik provided has helped with medication compliance, and that Whetzel has been fairly socially active, having a fiancee and friends, and helping out neighbors with simple work activities. (Tr. 22.) The ALJ pointed out that Whetzel "even admitted at the hearing that he could do work where he would not have to deal frequently with others, where he would not have to work around or with hazards, and where he could sit down from time to time." (Tr. 22.)

Despite this lengthy and detailed discussion, Whetzel quibbles with the ALJ's analysis, asserting that the ALJ erred in his reasoning regarding Whetzel's noncompliance with his medications. (Opening Br. 13-19.) Whetzel's arguments, however, amount to little more than a

nitpicking of the ALJ's decision. *See Rice v. Barnhart*, 384 F. 3d 363, 369 (7th Cir. 2004) (explaining that when reviewing the ALJ's decision, the court will "give the opinion a commonsensical reading rather than nitpicking at it").

The ALJ is entitled to take noncompliance with prescribed treatment into consideration in analyzing a claimant's credibility. *See* SSR 96-7p. An individual's statements may be discounted "if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." SSR 96-7p; *see, e.g., Ellis v. Barnhart*, 384 F. Supp. 2d 1195, 1203 (N.D. Ill. 2005). "[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record . . . ." SSR 96-p.

Whetzel first contends that the ALJ improperly dismissed financial constraints as a reason why he was unable to comply with his medication regime. (Tr. 14.) The ALJ reasoned that the record reflected problems affording medicine, "despite the fact that [Whetzel] has been working on a fairly sustained basis." (Tr. 22.) Whetzel notes that he lost Medicaid at one point, earned little money working part-time, and experienced periods of unemployment. While these facts may be true, they do not show that the ALJ's reasoning itself was "patently wrong." *Powers*, 207 F.3d at 435. Indeed, the record supports the ALJ's statement that Whetzel experienced periods of employment, and consequently the ALJ could reasonably conclude that while employed Whetzel had the ability to procure medicine. *See Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (affirming an ALJ's credibility determination, even though it was "a bit harsh" due to the fact that the claimant did not pursue treatment because of financial constraints,

and explaining that "an ALJ's credibility assessment will stand as long as [there is] some support in the record" (internal quotation marks and citation omitted)).  Furthermore, the ALJ fulfilled his duty under SSR 97-6p, *specifically considering* Whetzel's explanation for noncompliance with medication – his financial difficulties – simply noting that he at least had some employment.  (*See* Tr. 22.)  The record supports these facts, and "[t]his court will affirm a credibility determination as long as the ALJ gives specific reasons that are supported by the record for his finding."  *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004) (citations omitted).

  "[W]hen making a credibility determination, the ALJ must ground in the record any adverse conclusion he draws from the effects of and reasons for a claimant's failure to comply with recommended treatment."  *Nelson v. Barnhart*, No. 06-C-249-C, 2006 WL 3042954, at *8 (W.D. Wis. Oct. 24, 2006); *see also Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000) (finding error where the ALJ discredited a claimant's testimony on the basis of treatment noncompliance absent a finding that the prescribed treatment would restore the claimant's ability to work).  Here, the ALJ specifically found that "when [Whetzel] is taking his medications, his seizure disorder becomes stable."  (Tr. 22.)  In support of this reasoning, the ALJ highlighted Dr. Ottinger's records stating that Whetzel's seizures improved when taking his medication.  (Tr. 22.)  Furthermore, the ALJ mentioned Dr. Dodzik's report that the alarmed pill box helped with medication compliance (Tr. 22), the same report in which Dr. Dodzik noted that Whetzel had no seizure activities (Tr. 288).  The ALJ adequately supported his reasoning with specific citations to the record, and thus we must defer to the ALJ's judgment in this instance.  *See Getch v. Astrue*, __ F.3d __, 2008 WL 3403463, at *7 (7th Cir. 2008) ("We defer to an ALJ's credibility

determination and shall overturn it only if it is 'patently wrong.' Reviewing courts therefore should rarely disturb an ALJ's credibility determination, unless that finding is unreasonable or unsupported.") (citations omitted).

Furthermore, the ALJ did not discredit Whetzel just because he was noncompliant with his medication regime. Rather, Whetzel's condition improves when he is medication compliant, rendering his statements about the severity of his symptoms not "fully supported" and "not entirely consistent" with the medical records and his course of conduct. (Tr. 22.) The ALJ pointed to specific facts grounded in the record supporting this conclusion as SSR 96-7p requires, and thus the attack on the ALJ's credibility determination fails to warrant a remand.

Significantly, the ALJ's credibility finding was not predicated solely upon Whetzel's noncompliance with his medication regime, but also on the fact that his activities belied his extreme complaints. (Tr. 22.) The ALJ rightly considered Whetzel's daily activities in assessing his credibility. *See* 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i) (*specifically instructing* an ALJ to consider a claimant's daily activities when evaluating subjective complaints); *see generally Rice*, 384 F.3d at 371 (finding that the ALJ properly considered the claimant's daily activities, among other factors, when assessing credibility); *see, e.g., Jones v. Barnhart*, No. 04 C 3532, 2005 WL 66072, at *10 (N.D. Ill. Jan. 10, 2005) (considering claimant's ability to care for his two children, perform household chores, drive a car, and maintain his personal grooming as probative of the credibility of his testimony of debilitating limitations).

In furtherance of this reasoning, the ALJ listed Whetzel's various activities that conceivably conflict with his allegations of severe disability: he had a fiancee with whom he kept an apartment, he frequently visited three good friends with whom he played games and

watched movies, he played Dungeons and Dragons with other friends regularly, he worked part-time on a sustained basis since high school, and he helped his neighbors with simple work activities. (Tr. 22); *see also Berger*, 516 F.3d at 546 (affirming the ALJ's credibility determination and finding that the claimant's ability to perform part-time work undermined his claim of total disability, as did his other activities, including lawn-mowing, cleaning, and light construction). The ALJ also mentioned that Whetzel admitted at the hearing that he could work full-time if he did not have to deal frequently with others, not work around hazards, and sit from time to time. (Tr. 22.) Thus, the ALJ actually provided a variety of reasons for his credibility determination that are grounded in the record. *See Skarbek*, 390 F.3d at 505 ("This court will affirm a credibility determination as long as the ALJ gives specific reasons that are supported by the record for his finding.").

In sum, the Court should not accept Whetzel's plea to re-weigh the evidence in the hope that it will come out in his favor this time. *See Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 447 (7th Cir. 2004). "The ALJ's credibility determination was not 'patently wrong,' or divorced from the facts contained in the record." *Berger*, 516 F.3d at 546. Therefore, it is recommended that the ALJ's credibility determination, which is entitled to special deference, *see Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007), not be disturbed.

*D. Substantial Evidence Supports the ALJ's Evaluation of Dr. Cyran's Medical Opinion.*

Whetzel takes issue with the ALJ's analysis of the opinion of Dr. Cyran, the psychiatrist at NEC who reviewed Whetzel's treatment plan. Dr. Cyran opined that Whetzel had marked or extreme limitations in every category, but the ALJ afforded his opinion "little weight." (Tr. 18, 283-84.) Whetzel contends that the ALJ ignored evidence supporting Dr. Cyran's findings and

applied an incorrect legal standard, but ultimately these contentions lack merit.

The Seventh Circuit Court of Appeals has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).

In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996). The Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Here, the ALJ expressly considered Dr. Cyran's opinion and wrote an extensive explanation (that is, two lengthy paragraphs occupying two-thirds of a page) as to why he ultimately assigned it "little weight." (*See* Tr. 18.) The ALJ pointed to numerous

inconsistencies between Dr. Cyran's opinion and other substantial evidence, including that Dr. Cyran's findings were "not consistent with the NEC records, with [Whetzel's] course of conduct, including his ability to perform sustained work activities, or with the other medical evidence of record, including the neuropsychological evaluation . . . ." (Tr. 18.)

The ALJ found that the limited treatment records from the NEC did not support the marked and extreme limits in the medical source opinion, pointing to a specific NEC record indicating that Whetzel had the capability to do well in school if he was interested in the subject, contradicting the alleged memory and attentional capacity problems. (Tr. 18.) He pointed out that the NEC records reported that Whetzel quit college because he was noncompliant with his seizure medicine, not because of a mental impairment. (Tr. 18, 299.) He further reasoned that there is no evidence of major emotional problems, and that the notes indicate that Whetzel went to NEC because his mother wanted assistance with his organization and to acquire a diagnosis and treatment for possible Asperger's syndrome, of which, as the ALJ notes, neuropsychological testing later proved he only had mild symptoms. (Tr. 18.) Indeed, the record itself lends credence to the ALJ's conclusion that Dr. Cyran's findings of more severe impairment are contradicted by the NEC records, as one note, approximately a year into Whetzel's treatment, indicated that his therapist and case manager had "cut back contacts due to his stability[.]" (Tr. 298.)

Besides noting inconsistencies with the NEC records, the ALJ pointed to other medical records that he found inconsistent with Dr. Cyran's dire assessment – Dr. Dodzik's neurological exam. The ALJ then discussed an array of Dr. Dodzik's observations and test results, including that Whetzel had an average IQ but weaknesses in working memory, and mild signs of

Asperger's but no "full-blown nonverbal learning disability or cognitive complaints." (Tr. 18.) *See* 20 C.F.R. §§ 404.1527(d), 416.927(d) (providing that consistency with substantial evidence and the record as a whole is to be considered in evaluating a medical opinion).

Moreover, aside from finding that Dr. Cyran's opinion did not merit controlling weight, he also assessed the opinion under several of the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d). *See generally Books*, 91 F.3d at 979 (articulating that when conflicting medical evidence exists, the ALJ must consider the factors set forth in the regulations). The ALJ considered the nature and extent of the treatment relationship, 20 C.F.R. §§ 404.1527(d)(2)(ii), 416.927(d)(2)(ii), noting that although Whetzel was offered assistance with his activities of daily living, he never connected with the services or took advantage of the assistance; that at the time of his termination in January 2006 he had not contacted NEC since July 2005;[6] that he never underwent a psychiatric medication assessment; and that Dr. Cyran was involved more as a supervisor than a direct treatment provider. (Tr. 18.) Also, the ALJ detailed Whetzel's various activities which he could reasonably conclude are inconsistent with Dr. Cyran's opinion that Whetzel has marked or extreme impairments (*i.e.*, his ability to sustain employment, his socialization with friends, his assisting elderly neighbors in chores, and his frequent internet use at the library). (Tr. 18, 20-22.)) *See* 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4) ("Generally,

---

[6]Whetzel argues that the ALJ erred in noting that Whetzel did not participate in other offered services since there is evidence that Whetzel may not have been able to afford them at times. This argument, however, is misplaced. The ALJ was simply describing the depth of Whetzel's contacts with the NEC – that he did not participate in all the services offered – and, as noted *supra*, the nature and extent of the treatment history is a factor for the ALJ's consideration. 20 C.F.R. §§ 404.1527(d)(2)(ii), 416.927(d)(2)(ii). Furthermore, the ALJ could still reasonably infer that Whetzel's lack of participation in the services does not indicate serious emotional problems, since apparently at times he was able to afford their services and still did not engage in the other programs. (*See, e.g.*, Tr. 295 (noting that Whetzel was employed at a pizza place and had Medicaid at least some of the time he was working there)); *see Stevenson v. Chater*, 105 F.3d 1151, 1155 (7th Cir. 1997) (acknowledging that an ALJ is entitled to make reasonable inferences from the evidence before him).

the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). In sum, the ALJ properly analyzed Dr. Cyran's opinion, setting forth numerous examples, grounded in the record, of evidence inconsistent with Dr. Cyran's findings, and addressing various 20 C.F.R. §§ 404.1527(d) and 416.927(d) factors along the way.[7]

Whetzel also argued that "an ALJ must give controlling weight to the treating source's opinion if it is 'not inconsistent' with other substantial evidence in the record; it need not, as the ALJ stated, be 'consistent' with the record" (Opening Br. 20), citing *Dominguese v. Massanari*, 172 F. Supp. 2d 1087, 1100-01 (E.D. Wis. 2001); thus, Whetzel essentially asserts that the ALJ used an incorrect standard in assessing Dr. Cyran's opinion. In *Dominguese*, the Court found that the ALJ erroneously concluded that the treating physician's opinion only received controlling weight if the record supported it. *Id*. In the instant case, however, the ALJ simply showed that Dr. Cyran's opinion *was inconsistent* with other substantial evidence of record, *pointing to specific examples* within the NEC records, in Dr. Dodzik's tests, and Whetzel's conduct that conflicted with the notion of marked or extreme impairment. (Tr. 18-22.) *See* SSR 96-2p; SSR 96-8p; 20 C.F.R. §§ 404.1527(d), 416.927(d) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by

---

[7]Whetzel also asserts that because the ALJ found that the NEC notes of record did not support Dr. Cyran's position, he should have re-contacted NEC for information about Whetzel's 22 other visits with the therapist. (Opening Br. 20.) However, as the Commissioner points out, an ALJ must re-contact medical sources only when the evidence at hand is inadequate to determine whether the claimant is disabled. 20 C.F.R. §§ 404.1512(e), 416.912(e). If the ALJ can reach his determination without more information then he need not re-contact the medical sources. *Skarbek*, 390 F.3d at 504. Here, the ALJ does not connote any confusion with respect to the NEC records, but rather was able to point out specific details from the NEC notes inconsistent with Dr. Cyran's assessment of marked or extreme mental impairments. (*See* Tr. 18.) At least one of the NEC records, the Termination Summary Sheet, was a detailed summary of Whetzel's treatment at NEC, apparently encapsulating his treatment history there. (*See* Tr. 295.) Moreover, the other records apparently pertained to Whetzel's visits to NEC with a therapist, not a psychiatrist. (Tr. 295-98); *see* 20 C.F.R. §§ 404.1513(d), 416.913(d) (classifying therapists as "other sources" which the ALJ may consider but do not require the application of the treating source rule).

medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence* in your case record, we will give it controlling weight." (emphasis added)).  To the extent that the record contains conflicting evidence about the severity of Whetzel's limitations, it is the ALJ's role to weigh the conflicting medical evidence and resolve the conflicts.  *See Richardson v. Perales*, 402 U.S. 389, 399 (1971) ("We . . . are presented with the not uncommon situation of conflicting medical evidence.  The trier of fact has the duty to resolve that conflict.").  The ALJ did just that, and though Whetzel may disagree with the ultimate weighing of the evidence, such disagreement is not a basis for remand.  *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("[The Court may not] reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner.").

In sum, the ALJ's assessment of Dr. Cyran's opinion is supported by substantial evidence and does not warrant a remand of the case.

## E.  The ALJ's Determination That Whetzel Has Moderate Impairment in Maintaining Concentration, Persistence, or Pace Is Supported By Substantial Evidence.

Whetzel argues that the ALJ's determination that he had moderate, as opposed to more severe, limitations in concentration is not supported by substantial evidence.  (Tr. 23-24.)  More specifically, Whetzel contends that although the ALJ gave great weight to Dr. Dodzik's medical opinion, this was only because the ALJ selectively reviewed the report and thus failed to mention Dr. Dodzik's statement that Whetzel had "marked impairments in many measures of inattentiveness and vigilance over time" and that "the data suggested difficulties with attentional capacity and control from both a sustained and divided format."  (Opening Br. 23; Tr. 287.) Whetzel's argument, however, is short-sighted in view of both Dr. Dodzik's opinion as a whole

and the ALJ's consideration of it in his opinion.

An ALJ "need not provide a written evaluation of every piece of evidence that is presented," *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004), as long as the reviewing court is able to trace the ALJ's path of reasoning, *see Rice*, 384 F.3d at 371. Here, the ALJ discussed the report, penning multiple paragraphs on it, referencing it throughout his opinion, and assigning it significant weight (Tr. 18-22), suggesting that it received his full consideration. Although the ALJ did not mention the particular test results at issue, it is clear that the ALJ specifically considered Dr. Dodzik's findings on attentional capacity, as in a different part of the opinion he explained, "[N]europsychological testing noted . . . difficulties in attention span . . . but Dr. Dodzik concluded that some of his attention problems were probably due to seizures." (Tr. 22.) Thus, this is not a scenario where the ALJ ignored an entire line of evidence necessitating a remand. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) ("If the ALJ were to ignore an entire line of evidence, that would fall below the minimal level of articulation required.") Furthermore, the ALJ clearly took into account Dr. Dodzik's finding that Whetzel has difficulties with attentional capacity, incorporating multiple significant concentration-related limitations in his RFC: limiting him to simple, routine, repetitive tasks, not performed in a fast-paced environment, involving only simple work related decisions and relatively few workplace changes, as well as no frequent reading and no math calculations. (Tr. 20.) *See, e.g. Valla v. Astrue*, 3:07-cv-370-bbc, 2008 U.S. Dist. LEXIS 10115, at *40 (W.D. Wis. Feb. 8, 2008) (in affirming an ALJ's finding of moderate concentration impairment, taking into consideration that "the administrative law judge accounted for plaintiff's difficulty in maintaining concentration, persistence or pace" in his RFC assessment).

Moreover, although Dr. Dodzik indeed revealed that Whetzel had "marked impairments in many measures of inattentiveness and diligence over time," he also discussed other attentional capacity test results which actually revealed a range of impairment, rather than decidedly marked impairment, in that category. (Tr. 287.) Indeed, on one attentional capacity and control test, Whetzel had an average score, and on another he scored in the moderate range of impairment (Tr. 287), supporting the propriety of the ALJ's finding of moderate impairment. In addition, Dr. Dodzik's ultimate impression was actually encouraging, suggesting that Whetzel's "lingering working memory and attention problems" were typical for patients with ongoing seizure activity, specifically opining that there was no "critical need for intervention," and instead recommending merely adaptive services and a stimulant medication to assist Whetzel in his plan to return to school. (Tr. 288.) Even though Dr. Dodzik noted some marked impairments (Tr. 287), he did not state that these impairments precluded him from attending a job and focusing on even simple, repetitive tasks. On the contrary, Dr. Dodzik *specifically planned to help Whetzel find employment* and return to school if his seizures were under control. (Tr. 288-89.) Thus, the ALJ could reasonably conclude that Whetzel's concentration impairment was moderate, and the Court should not substitute its judgment for the ALJ's. *See Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000) ("[W]e cannot reweigh the evidence or substitute our own judgment for that of the ALJ. If reasonable minds can differ as to whether [the claimant] is disabled, we must uphold the decision under review.") (citations omitted).

Further supporting the ALJ's determination is that the ALJ articulated a compelling reason, supported by the record, why he found the impairments only moderate – Whetzel's ability to sustain continuing employment is inconsistent with marked impairments in

concentration. (Tr. 20.) Indeed, at the time of the hearing, Whetzel had been working six to ten hours a week at McDonald's for six months (Tr. 335), and he also has a history of long-term part-time employment as a bagger (Tr. 40, 339). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Limitations in concentration, persistence, or pace are best observed in work settings. . . ."). Significantly, Whetzel testified that his current employer was happy with his pace, *see id.* ("We must assess your ability to complete tasks by evaluating all the evidence, with an emphasis on how independently, appropriately, and effectively you are able to complete tasks on a sustained basis."), and that the reason he does not work more hours was because of a concern that it will trigger a seizure, *not* because of any concentration or focus problems. (Tr. 21, 335, 353.) Consequently, the ALJ's reasoning is both easily traced and supported by the record.

Furthermore, other opinions support the ALJ's conclusion of moderate limitations. The state agency doctors, who reviewed Whetzel's record and completed the Psychiatric Review Technique form, found *no* medically determinable mental impairment. (Tr. 162-75.) Although the ALJ ultimately assigned little weight to this determination, it nonetheless supports a finding of less-than-marked impairments in concentration. *See Scott v. Sullivan*, 898 F.2d 519, 524 (7th Cir. Wis. 1990) (noting that an ALJ may rely upon the state agency physician's opinion).[8]

---

[8]Whetzel also argues that the consultative psychological evaluation of Dr. Huang undermines the ALJ's conclusion that he has only moderate impairments in concentration. Dr. Huang does conclude that Whetzel's seizure disorder affects his concentration, creating difficulty working full-time (Tr. 139), but she did not specifically opine that he had a marked impairment in concentration. Rather, his condition of having to rest for two days following a seizure led her to the conclusion that he could only work part-time. (Tr. 139.) In fact, the results of the WAIS-III were average and she found him free of a learning disability. (Tr. 139-40.) Thus, Dr. Huang's opinion does little except conclude that Whetzel has concentration problems resulting from his seizure disorder, a fact the ALJ also acknowledged and accounted for in his RFC assessment, as discussed *supra*.

Whetzel further contends that the ALJ erred in discounting Dr. Huang's opinion. (Opening Br. 24.) This contention is of little consequence, considering that, as we just established, Dr. Huang's opinion lends nothing to Whetzel's argument that it undermines the ALJ's determination. Moreover, even if considered, Whetzel fails to point to any particular error in the ALJ's reasoning.

Specifically, the ALJ opined that Dr. Huang did not give a DSM IV diagnosis on either Axis I or II, but rather diagnosed grand mal seizures on Axis III, and on Axis IV stated that Whetzel's seizures affected his memory

In short, the ALJ's determination is adequately supported by the medical records and his reasoning about Whetzel's ability to sustain part-time work. As a result, it is recommended that Whetzel's argument that the ALJ's determination is not supported by substantial evidence not prevail.

## V.  CONCLUSION

For the foregoing reasons, the undersigned Magistrate Judge recommends that the Commissioner's decision be AFFIRMED.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for the parties. NOTICE IS HEREBY GIVEN that within ten days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings or recommendations. Fed. R. Civ. P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.

SO ORDERED.

Enter for this 21st day of August, 2008.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

---

and concentration and that he was very tired after a seizure. (Tr. 19.) The ALJ continued, "Dr. Huang noted that she was told that it took two days of rest after a seizure for the claimant to recover and start normal activities. Since Dr. Huang did not really analyze the claimant's mental impairments and, rather, focused on the effects of the claimant's seizure disorder, the undersigned has given her evaluation little weight." (Tr. 19.) This reasoning is supported by the record, being true that despite the fact that Dr. Huang conducted a psychological evaluation, she did not diagnose any mental disorder and instead focused on the account of his seizure disorder. (Tr. 140.) Thus, the Court should not entertain Whetzel's plea to re-weigh the evidence and substitute its judgment for the ALJ's. *Clifford*, 227 F.3d at 869 ("In our substantial evidence determination, we review the entire administrative record, but do not . . . substitute our own judgment for that of the Commissioner.").